CHIEF JUSTICE PETERS
delivered the opinion oe the court:
From an order of the Gallatin county court, admitting to record a writing dated the 2d of April, 1860, as the last will of David Lillard, deceased, contestants appealed to the circuit court of said county, where they recovered a verdict and judgment setting aside said testamentary document, and the propounders have appealed to this court.
The deceased, at the time of his death, which occurred in January, 1861, was about 78 years of age; was possessed of a large real and personal estate, all of which (except some specific legacies, inconsiderable in amount) he gave by the contested paper to his seven surviving children, giving to contestants, who are the children of his deceased son, John Lillard, the sum of eighteen hundred dollars only.
The testamentary document is assailed on two grounds. 1. The exercise of undue influence over the deceased by his son, Joseph Lillard, and his son-in-law, T. J. Turley. 2. That he was not, at the date of the instrument, of disposing mind and memory. These grounds will be considered in the order they are here stated.
*118 The document was written at the house of the deceased, on the day it bears date, by H. J. Abbett, an intelligent lawyer of high character, who proves that he attested it, at the request of David Lillard, in his presence, and in the presence of Turley, the other subscribing witness, who also attested it, at the request of said Lillard, in his presence and that of Abbett.
That on the morning of the day on which it was written he received a note from Joseph S. Lillard, stating that his father desired to see him; and as he desired to go to the Henry circuit court, which was then in session, he had an early dinner, and, after he dined, set out for the residence of the deceased, which he reached between two and three o’clock in the afternoon, it being distant about eight miles from Warsaw, where witness lived. In passing the residence of Joseph S. Lillard, he told witness to go on to his father’s, and he would overtake him before he got there. He did overtake him, and they went in the house together, saw Mrs. Lillard and a young lady there; he went into the old gentleman’s room, and found him lying on his bed; he recognized him, and after' the usual compliments, and some little conversation, he informed witness that he wanted him to prepare his will, and requested some one of the family to get paper, ink, &c.; and then every person left the room except himself and the old gentleman. A former will was then handed him; whether deceased took it out of a drawer, or sent some one up stairs for it, he did not recollect. He read it section by section, and as each section was read, the old man would direct what changes (if any) were to be made. The changes were made as he directed, and those in which no changes were to be made he wrote down substantially as they were in the old will, and in this way the paper offered by the propounders was written. The *119 old will, which was before him, he thinks was in the hand-writing of Thomas M. Lillard, was witnessed by some of the Deans, and was dated some two or three years previous to the 2d of April, 1860.
No one prompted or made a suggestion to deceased while witness was engaged in the writing and making the alterations in the old will, as he was directed, and which he did just as he was told to do by deceased, and they were written. He was unable to state all the changes that were made. One change he remembers was, that, in the will he wrote, two hundred dollars more are given to the contestants than were given to them by the old will. Another change was the bequest to his wife, to whom he was not married until aft dr the old will was written. The bequest to his wife was not because she needed it, but as a mark of affection and token of respect for her, as he stated to him when writing. Another change was remembered: in the old will Thos. M. Lillard was named as executor with Jos. S. Lillard and Thos. J. Turley; in the last one Thomas M. Lillard was omitted, because, as he said, Thomas had removed to Arkansas, and the other two could attend to the business.
Witness had known Mr. Lillard eighteen years before his death; they lived about eight miles apart; his acquaintance, in the last eight or ten years, had been more intimate; he was counsel for him in an important suit in the Henry circuit court, and had had several conferences with him about that suit, though his son Joseph was the active agent in attending to the suit. He had seen the deceased eight or ten times in the last five years before the 2d of April, 1860. He supposed his mind was not as vigorous then as it had been in his earlier years, but he was then competent to make a will. He saw nothing to *120 cause him to doubt his capacity, and, if he had doubted it, he could not have been induced to write the will. No one was in the room while he was writing. Mrs. Lillard, or the young lady who was there, might have passed through the room. After the will written by the witness was signed and attested, he thinks the old gentleman threw the old one in the fire.
James H. Turley, the other subscribing witness, proves that, in passing by, he was called in by Joseph S. Lillard, who told him his father wished to see him. He got down and was shown into the old man’s room by Joseph; found no one in there but Mr. Abbett and the old man. When he went in, the old man informed him he had made his will, and desired him to witness it, which he did in the presence of Mr. Abbett and.the old man, after Mr. Abbett had wiitten his name to it by his request, and he had made, his mark. Witness had known deceased for many years; lived within a half mile of him, on an adjoining farm, for the last eight years; had several business transactions with him, and had two trades with him after the date of the paper which he attested — the first in June, 1860. He purchased some cows and heifers from him, which he took to Cincinnati, and did not sell them there for as much as he gave for them. The next was in September, 1860, when he purchased some steers of him, and did well. T. J. Turley was with him when he purchased the steers. He thought the old man competent to make a will when he was called on to witness the paper in contest. He saw Jefferson Turley, Joseph S. Lillard, and a lady he took to be Mrs. Jefferson Turley, in an adjoining room when he witnessed the will.
Having given the evidence of the two subscribing witnesses somewhat in detail, we now refer to that of Mrs. Lillard, the widow of the deceased, who was introduced *121 as a witness by the contestants, and whose very clear and impartial statement aids much in the solution of the propositions under consideration. She states, upon one occasion she heard Joseph S. Lillard say to his father: “ ‘Father, you must have your will wrote; I am going to have mine written; I am going to send for Mr. Abbett tomorrow, and he can write both.’ The next day Mr. Abbett came with Joseph Lillard and Jeff. Turley, and wrote the will. This was about the 1st of April, 1860. I did not notice any perceivable change in his mind when the will was executed; he was better than he had been, and was able to sit up. In 1860 he said he could not give in a list of his blacks; in making out his list I am not able to say whether he was able to give in his list for 1860 or not. Joseph Lillard and myself gave testator’s list in 1859 or 1860.”
“ His mind got better about April, as he got over his sickness. Tom. Lillard, Joseph S, Lillard, and Jeff. Turley, visited him frequently. Tom. Lillard moved out of the State in 1860. ' Some time in March, 1860, while testator was recovering, I heard that my daughter was sick in Grant county, and I asked his consent to go up to see her, and asked to know if he felt well enough for me to leave him; he consented, and I left on Thursday and returned on the following Sunday evening. He seemed in a passion, and said he would go to Missouri, and that I .could go to my children. My feelings were very much hurt, and I could not account for his manner. His son David had taken him that day, before I returned, to his daughter’s, Mrs. Turley. Upon .his making the remark to me upon my return, I inferred some one had tried to prejudice him agamst me. The next morning he seemed as kind as usual, and did not again refer to the subject. He gave no reason for wanting to go to Missouri. *122 His son David, who resides in Missouri, wrote a letter to come in and remove him. Witness asked him why he did not answer David’s letter.? ‘Because,’ he said, T do not want him.’ I never consulted testator about the management of his farm, that he did not talk sensibly about it. He had lost some of his energy, but I do not know he had lost any of his interest in its management. He often complained that he could not get things done on the farm as he wanted. I never heard any one approach him on the subject of his will. The witness herself could not recollect the number or names of testator’s negroes. His friends in whom he had confidence could influence him,.”
We have now stated substantially, if not in the very language of the witnesses, the evidence of what occurred at the time the document was written, and the means by which the draftsman’s attendance was procured.
It certainly was not respectful, and was unbecoming in Joseph, to approach his father in the way he did on the subject of making his will, and quite as officious in him to send for Mr. Abbett to write it; and his statement that he intended to have his own will written probably untrue, as there is no evidence that he had it done. But however reprehensible and unfilial the conduct of Joseph towards his father may have been on this occasion, there is no proof that either he or Turley then, or at any other time, either importuned or solicited his' father to favor them particularly by his will, or even suggested to him how they desired him to dispose of his estate.
Joseph Lillard and Turley were with Abbett when he arrived at the residence of the deceased; but they had no private interview with him, and did not say a word to him on the subject of his will. While Abbett was writing *123 they were excluded from the room, and had no conversation with him until the writing was completed.
When and how was there an undue influence exerted over David Lillard in the making of a will? That question is not answered in this record. It is true, Mrs. Lillard says that his friends in whom he had confidence could influence him; but she also says, “ I never heard any one approach him on the subject of his will” — meaning, no doubt, that she never heard any one approach him on the subject of how he would dispose of his property. Such approaches are generally made cautiously and insidiously, and often difficult to prove. Nevertheless, in order to invalidate a will on account of undue influence, there must be proof that the instrument was obtained by importunity which could not be resisted. Such influence may not be exerted at the time the instrument was written; but there must be evidence of an influence which constrains him to do that which, if left to the enjoyment of a free exercise of his own judgment and choice, he would not do — that degree of coercion that destroyed free agency. There is no such proof in this case. On the contrary, there cannot be a doubt that the deceased had made a will several years before, when his capacity and freedom from all improper extraneous influences were unquestioned. The younger Dean, one of the subscribing witnesses, thinks it was executed and published in the winter of 1856. By that will, the contestants were not as liberally provided for as in this; and, from all that appears, Joseph S. Lillard and T. J. Turley could not have been actuated by selfish motives in desiring the former will to be destroyed and the second one made. The first grounds, therefore, do not seem to us to be made out.
On the remaining question but little need be said.
*124 The deceased was a farmer, and a minister for many years in the Baptist Church. As a farmer, he was eminently successful, and as a minister of the gospel, acquired an honorable distinction amongst his brethren, having been chosen by the delegates of the several churches composing the association to which he belonged their moderator to preside over their delibérations nineteen out of twenty years successively; and the year he was not elected he was detained at home by sickness, and was chosen the moderator of the last association he ever attended, which was after the date of the contested paper.
He was married to his last wife in March, 1859, when no witness who was examined doubts his mental ability to attend to and transact his business. He continued to manage his estate after April, 1860, and up to his death, without an overseer; sold stock and produce; made settlements, and understood his business in detail. When his wife talked to him about the management of his farm, she says he always talked sensibly; he seemed to have lost some of his energy, but none of his interest in its management.
Some confusion and difficulty occurred about the 1st of April, 1860, with the assessor, in his list of taxable property; but the title to quite a number of his slaves was in litigation; consequently, he may reasonably have thought, as his title was doubtful, a very small value should be placed upon them. But be that as it may, what then occurred cannot outweigh numerous other facts showing that he was a man of intelligence and understanding. Similar confusion occurred afterwards with the deputy marshal; but that was after the publication of the testamentary document.
Some of the witnesses who were at the last association over which deceased presided express an opinion that he *125 manifested want of capacity; but a majority of the members who were examined were of a different opinion.
After a review of all the facts in the case, we cannot doubt that David Lillard, at the date of the contested document, was of disposing mind and memory, and that the same is his true last will and testament.
Wherefore, the judgment is reversed, and the cause remanded, with directions to affirm the judgment of Gallatin county court, and for further proceedings consistent herewith.